| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Memorandum and Order** |
| | ) | |
| **DERRICK RAYSHAWN PARKS, and** | ) | |
| **KENDRICK TREMAYNE OAKLEY,** | ) | |
| **Defendants.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on Defendant Parks' Motion for New Trial, in which Defendant Oakley joins.  (Documents #87, #88 and #106)  The Government opposes the motion. (Documents #96, #112)

## I.  Relevant Background

On December 13, 2005, the grand jury returned a one count Bill of Indictment against Defendants Kendrick Tremayne Oakley ("Oakley") and Derrick Rayshawn Parks ("Parks") alleging participation in a conspiracy to possess with the intent to distribute quantities of cocaine and cocaine base, Schedule II controlled substances, in violation of 21 U.S.C. §846  from on or about January 1999 through December 5, 2005.[1]  (Document #1)

Defendants pled not guilty and proceeded to trial.  Jury selection occurred on January 17, 2007, and the jury was impaneled the same day.  Counsel made their opening statements to the jury and the Government began presenting its case-in-chief.   Court resumed at noon the following day.

---

[1] This case is related to another multi-defendant (37 total co-conspirators) drug conspiracy successfully prosecuted in this district.  *See*  United States v. Eckles, et al., 5:05CR9-V.  The Eckles conspiracy was widespread and had a significant effect on the communities of Harmony and Statesville.

On January 19, 2007, after returning from lunch on the third day of trial, three different jurors complained to court personnel that they had been either threatened or intimidated since the commencement of trial.[2]  Upon learning of the jurors' complaints, the Court conducted *voir dire* of Jurors Jolly, Stover, Watts and Cooper in chambers.[3]  Mr. Stover (Juror No. 7), the first juror to speak to court security about a concern, reported an uncomfortable encounter with multiple bystanders as he left the courthouse on Wednesday, January 17th.  (Trial Tr.: 544-46)  According to Stover, as he left the building several people he had previously observed sitting behind the defendant in court were gathered in a group of ten or twelve in front of the courthouse.[4]  Stover reported to court security feeling "intimidated by the people staring at him."  (Trial Tr.: 528)  Juror Stover stated that the incident would not affect his ability to go forward as a juror.  (Trial Tr.: 549)   He then agreed with counsel that he was "pretty comfortable" that he could put this behind him.  (Trial Tr.: 549-50)

The Court also learned that indirect threats had been made to at least two female jurors,  Juror Jolly (Juror No. 1) and Juror Watts (Juror No. 14).   Juror Jolly reported that as she walked back from lunch she was approached by a black male and female and advised that if the jury found a conviction, "we better be ready to deal with the consequences that come along with that," and that

---

[2] It is standard practice in the Western District of North Carolina for jurors to take lunch on their own within the time allotted.  The degree of outside contact with jurors at lunch reported in this case has no parallel in the past twenty years, at least in the Statesville Division.

[3] At the suggestion of the Court, and upon the agreement of counsel, defense counsel were present in chambers for the individual *voir dire* of each of these jurors but the Defendants themselves were not. (Trial Tr.: 536)

[4] The trial was unusually well-attended, which created some difficulty.  Before the mid-day recess on January 19, 2007, the Court had to caution the spectators not to react visibly to the testimony by shaking or nodding heads or otherwise reacting to the evidence.   (Trial Tr.: 526)

"they know who we are." (Trial Tr.: 541) Juror Jolly indicated that she was "very scared" because she frequented many of the areas discussed in testimony thus far. (Trial Tr.: 542-43)

Juror Watts reported being approached while eating lunch with another member of the jury, Juror Cooper, and being advised by an unknown male that the jury should "go easy on Little Kenny." (Trial Tr.: 552) Juror Watts indicated that she could put the threat behind her as long as she felt safe getting out of the building. (Trial Tr.: 553)

Juror Cooper (Juror No. 2) corroborated Ms. Watts' description of events and added that a second gentleman sitting with the first speaker commented, "Leave him alone and go easy on him." (Trial Tr.: 554) Juror Cooper responded, "No, no problem" when asked about additional concerns and his ability to continue to serve as a juror. (Trial Tr.: 555) Juror Cooper also stated that he could follow the oath he'd been given and do the job he was assigned as a juror. (Trial Tr.: 556)

As a result of the reported threats and other concerns, the Court proposed to implement a number of precautions in an effort to preclude further improper juror contact as well as better ensure the jurors' safety. (Trial Tr.: 557-66) The Court and counsel agreed that jurors should park directly behind the courthouse in a gated area along with court personnel, that lunch either be brought in and served in the jury deliberation room (or that the jury be escorted to and from lunch by court security), and that jurors be escorted to and from their personal vehicles by court security officers. The Court also requested additional security from the U.S. Marshal's Service and enacted the proposed security measures immediately.

After the individual *voir dire* in chambers, Defendant Parks moved to strike Jurors Jolly and Cooper for cause. (Trial Tr.: 561-62) The Court discussed with the parties the best manner in which to proceed – the Court was to inquire of the entire jury and if any juror indicated an inability to serve

as an impartial juror, they would be dismissed for cause.[5] (Trial Tr.: 562-63)

The jury was then brought into the courtroom for further instruction and inquiry outside of the presence of the Defendants or any other spectators. The Court addressed the jury as a whole,[6] and asked: whether they were (collectively and individually) willing and able to continue in light of the heightened security measures; whether they could render a verdict based on the evidence presented; whether they could follow the law as instructed by the Court; and whether they could "separate any concern about bystanders." (Trial Tr.: 568) The jurors all responded affirmatively and indicated their willingness to continue with the trial. (Trial Tr.: 568) The jury was excused prior to resuming the presentation of evidence.

Both Defendants orally moved for mistrial.[7] (Trial Tr.: 569-70) Ruling from the bench, the Court denied both motions. (Trial Tr.: 570) The Court also addressed the courtroom spectators and instructed all spectators not to engage with the jurors in any way. (Trial Tr.: 570-71) The trial eventually resumed and proceeded without incident. At the conclusion of the evidence, Defendants unsuccessfully sought to strike Jurors Jolly and Cooper again. (Trial Tr.: 1003-05)

On January 24, 2007, the jury returned a verdict of guilty as to both Defendants on the drug conspiracy offense charged in Count One. (Documents #77, #78) The courtroom deputy polled the

---

[5] Counsel did not pose any questions to Juror Jolly in chambers regarding her ability to follow the law and remain impartial. (Trial Tr.: 560) Even so, after some discussion about how best to proceed given this fact, the Court elected not to single Juror Jolly out again by questioning her individually in chambers a second time. (Trial Tr.: 559-63) Instead, the Court addressed the jury as a whole and contemplated revisiting the issue if Juror Jolly continued to appear upset or troubled after the proposed security measures were put into place.

[6] The Court's inquiry revealed that the jurors' individual experiences and concerns had been discussed by the jury as a whole. (Trial Tr.: 542, 548-49)

[7] Defendant Oakley also filed a written motion seeking a declaration of mistrial. (Document #71) The Government filed its response on January 19, 2007. (Document #72)

4

jury and each member individually affirmed their verdict. (Trial Tr.: 1106-07) After receiving the verdict, the Court denied renewed defense motions for judgment of acquittal and for a new trial. (Trial Tr.: 1108-09)

Through counsel, Defendant Oakley began an investigation of sorts regarding the effect, if any, the threats and intimidation had on the jury and its deliberations. While exploring these topics with the interviewed jurors, the investigator for the defense inadvertently discovered that Juror Martin possessed some prior knowledge of the Defendants that was not disclosed during *voir dire*.[8]

Approximately six months later, on July 10, 2007, Defendant Parks moved for a new trial and Defendant Oakley joined in the motion.[9] Defendants claim a new trial is warranted on the following grounds: 1) Juror Romie Martin's failure to disclose his knowledge of the Defendants during *voir dire* demonstrates bias; 2) The threatening and intimidation of jurors during the trial tainted the jury and their deliberations; and 3) Unanimity of the verdict was compromised by separate deliberations.[10] This matter is now ripe for disposition by this Court.

---

[8] The Court's standard practice, applied in this case, allows jurors to discuss after trial their jury experiences if they wish to do so. (This trial preceded the district's Local Civil Rule 47.1, effective January 1, 2008, which requires the moving party to demonstrate good cause and obtain leave of Court before contacting any juror with respect to its deliberations or the verdict reached.)

[9] The delay in reaching Defendants' motion for new trial is explained in part by the Court's indulgence in allowing the parties (both the prosecution and the defense) the additional time sought in order to investigate and respond adequately to the factual and legal issues presented. The Government did not seek Court approval to interview Juror Martin until October 9, 2007, and did not respond to the motion until November 14, 2007 - some four months after Parks' motion was filed. The defense also requested two extensions of time before submitting a reply brief on February 8, 2008.

[10] For a discussion of the second and third arguments, see Section "IV," *infra*.

## II.  Applicable Law

### A.  Rule 33 of the Federal Rules of Criminal Procedure

Defendants' motion for new trial is governed by Rule 33 of the Federal Rules of Criminal

Procedure, which provides in pertinent part:

> **(a) Defendant's Motion.**  "Upon the defendant's motion, the court may vacate any judgment and grant a new trial **if the interest of justice so requires** . . . ."
>
> **(b) Time to File.**
>
> > **(1) Newly Discovered Evidence.**  Any motion for a new trial grounded on newly discovered evidence must be filed **within 3 years** after the verdict or finding of guilty. . . .
> >
> > **(2)  Other Grounds.**  Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed **within 7 days** after the verdict or finding of guilty.

FED. R. CRIM. P., Rule 33 (2008)(*emphasis added*).  Thus, depending on the legal basis asserted in

support of the motion for new trial, different limitations periods may apply.

For purposes of Rule 33, the Fourth Circuit utilizes the following five-part test to determine

whether a new  trial should be granted on the basis of  "new evidence": (i) the evidence must in fact

be newly discovered since the trial; (ii) facts must be alleged from which the court may infer diligence

on the part of the movant; (iii) the evidence relied upon must not be merely cumulative or impeaching;

(iv) the evidence must be material to the issues involved; and (v) the evidence must be such that, on

a new trial, it would probably produce an acquittal.  United States v. Chavis, 880 F.2d 788, 793 (4th

Cir.1989).  According to Chavis, all of the criteria must be met or the motion for a new trial must be

denied.  Id.

**B.  Jurisdiction / Timeliness Under Rule 33**

The Government argues that because Defendants fail to present "new evidence" as defined by Rule 33, the Court lacks "jurisdiction" to entertain several if not all of the legal issues raised. Therefore, the Court must first determine which, if any, of the issues raised by Defendants are timely and properly before the Court.

In Eberhart v. United States, the Supreme Court explained that Rule 33 is "a claim-processing rule - one that is ***admittedly inflexible*** because of Rule 45(b)'s  insistent demand for a definite end to proceedings." Eberhart v. United States, 546 U.S. 12, 19 (2005) (*emphasis added*).  However, the Supreme Court also stated in Eberhart  that the rules prescribing timeliness under Rule 33 do not have the force of subject matter jurisdiction and are not "jurisdictional" in that sense.  Eberhart, 546 U.S. at 19.

Just two years later, in Bowles v. Russell, the Supreme Court held that time periods ***imposed by statute*** are no less  "jurisdictional" than Congress's other decisions limiting the jurisdiction of the federal courts.  Bowles v. Russell, 127 S.Ct. 2360, 2365-66 (2007) (*emphasis added*) (the timely filing of a notice of appeal in a civil case is a jurisdictional requirement as Rule 4(a)(6) of the Federal Rules of Appellate Procedure carries 28 U.S.C. §2107(a) into practice).   The Supreme Court reasoned:

> Jurisdictional treatment of statutory time limits makes good sense.  Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider.  Because Congress decides whether federal courts can hear cases at all, it can also determine when, and under what conditions, federal courts can hear them.  Put another way, the notion of 'subject-matter' jurisdiction obviously extends to classes of cases ... falling within a court's adjudicatory authority, but is no less jurisdictional when Congress forbids federal courts from adjudicating an otherwise legitimate class of cases after a certain period has elapsed from final judgment.

Russell, 127 S.Ct. at 2365-66 (*internal citations omitted*) (*emphasis added*); *See also* United States v. Smith, 62 F.3d 641, 648 (4th Cir.1995) (time limits set forth in Rule 33 are jurisdictional) (*citing* 3 Charles A. Wright, *Federal Practice and Procedure* §558 n. 1 (2d ed. 1982)). Based upon this authority, the Court has no discretion regarding enforcement of the time limits prescribed by Rule 33.[11] Accordingly, if Defendants have, in fact, failed to produce "newly discovered evidence," this motion must fail for want of jurisdiction.

### C. "Newly Discovered Evidence" Defined

The Government argues that "newly discovered" evidence for purposes of Rule 33 only encompasses evidence which is relevant to the ***actual factual innocence*** of the defendant. *See* United States v. Evans, 224 F.3d 670, 674 (7th Cir.2000) (a *bona fide* Rule 33 motion based upon newly discovered evidence supports a claim of innocence). The Seventh Circuit defines "newly discovered evidence" as evidence that could be adduced at trial in support of a contested factual issue. *See* Evans, 224 F.3d at 674; United States v. Spuza, 194 F.2d 671 (11th Cir. 2006). According to the Government, absent such a finding, the Chavis test outlined by the Fourth Circuit (*e.g.*, final factor / criteria requiring that the evidence be such that at a new trial it would probably produce an acquittal) would be nonsensical. Based on the same rationale, the Government contends that any constitutional claim or other type of collateral attack is properly brought under 28 U.S.C. § 2255 – not Rule 33.[12]

---

[11] Rule 33 may be contrasted with the procedural rule governing the timing for a notice of appeal at issue in Bowles because Rule 33 does not merely implement a statutory prescription. While the Federal Rules of Criminal Procedure are not statutory in the same sense, they are nonetheless promulgated for the approval of the Supreme Court and adoption by Congress.

[12] The Court at a minimum allows that Section 2255 is also a proper avenue for a constitutional claim alleging juror bias or misconduct in violation of the Sixth Amendment.

There is some appeal to the Government's argument because the term "evidence" is defined as: "something that furnishes proof" or "something legally submitted to a tribunal to ascertain the truth of a matter." *See* Merriam-Webster Online Dictionary (2008), available at www.merriam-webster.com. In addition, this construction of the rule is consistent with the <u>Chavis</u> test as a whole. However, there is authority within the Fourth Circuit for the proposition that the generally applicable standard governing whether new evidence bears upon a substantive issue of guilt does ***not*** apply where the newly discovered information "bears instead upon the integrity of the jury's verdict." *See* <u>United States v. Agnew</u>, 147 Fed. Appx. 347, 2005 WL 2114064 (4th Cir.2005) (trial judge's prior relationship with individuals associated with corporate entity victims deemed "newly discovered evidence" for purposes of Rule 33) (*unpublished*) (*emphasis added*) (*citing* <u>Holmes v. United States</u>, 284 F.2d 716 (4th Cir.1960)). In <u>Holmes</u>, the Fourth Circuit distinguished between a newly discovered evidence motion based upon the substantive issue of guilt versus a motion that bears upon the integrity of the trial. <u>Holmes</u>, 284 F.2d at 720. The circuit court explained:

> "Whether newly discovered evidence tends strongly to establish a defendant's innocence ***or shows the jury to have been subjected to improper influence***, the operation of the procedural rule should be the same. In either case, the movant makes a substantive showing that he is entitled to a new trial. In either case the motion is based upon ***information*** that the defendant does not have when the verdict is received. There is no assurance in advance that the ***information*** will come to light in so limited a time as five days after the verdict. Requirements of diligence and promptness are appropriate, for they provide flexible limitations which may be adapted to fit the circumstances."

<u>Holmes</u>, 284 F.2d at 719 (*emphasis added*).[13] With respect to the motion for new trial presented in

---

[13] The Government states that the Fourth Circuit's reference in <u>Holmes</u> to the time limitations as "flexible" directly contravenes the rule of law announced by the Supreme Court in <u>Eberhart</u> and <u>Bowles</u>. Because this Court does not rely on a "flexible" application of the prescribed time limitations, but instead on a broader interpretation of the term "evidence" – that evidence includes newly discovered information that threatens the integrity of the verdict – there is no need to address this argument.

Holmes, which the appellate court characterized as going to the integrity of the earlier trial, the Fourth Circuit ultimately held that "we apply *a different set of standards* to determine its sufficiency to support a timely motion." Id. at 720 (*emphasis added*).

The Government argues that Holmes has been undercut in recent years and should not be followed. In support of its position, the Government relies on United States v. Smith, where defendant learned post-conviction that defense counsel had a potential conflict of interest. *See* United States v. Smith, 62 F.3d 641 (4th Cir.1995). In evaluating whether "newly discovered evidence" included newly discovered information that would support an ineffective assistance claim, the Fourth Circuit held that it did not. Smith, 62 F.3d at 648 (a motion for new trial predicated on an ineffective assistance of counsel claim falls within the "other grounds" portion of Rule 33). The Fourth Circuit explained in part that what is "newly discovered" for purposes of the larger time period within Rule 33 must be *"evidence* that would be admissible were a new trial to be granted" because, if that were not the case, the rule "would more naturally refer to "newly discovered *facts*" or "newly discovered *information*.""" Smith, 62 F.3d at 649 (*emphasis in original*). The Smith panel stated that Holmes did not purport to advance any general test regarding when a new trial motion might qualify as one based on newly discovered evidence and did not compel any particular result *in that particular case*.[14] *See* Smith, 62 F.3d at 650. The court then expressly declined to answer the question now before this Court. Smith, 62 F.3d at 650 ("Of course, the question whether a new trial motion for

---

[14] One rationale offered for the decision in Smith was that it was not readily apparent why new trial motions based on a claim of jury tampering should qualify as motions based on "newly discovered evidence" while motions claiming ineffective assistance of counsel should not. Yet, Smith also explained why, as a practical matter, a claim of jury tampering might, in fact, be more amenable to treatment under Rule 33 than an ineffective assistance of counsel claim even though this type of claim may also give rise to a Sixth Amendment habeas claim. *See* Smith, 62 F.3d at 650 n. 5.

reason of improper jury contact may be treated as one based on newly discovered evidence, and therefore considered by the district court if filed after seven days from judgment, is not here presented.")    Thus, <u>Smith</u> did not overrule <u>Holmes</u> and the Government concedes as much. (Government's Suppl. Brf. at 5.)    The Government also concedes that <u>Smith</u> is not a "juror misconduct" or "juror bias" case.    (Government's Suppl. Brf. at 4-5.)    In any event, <u>Smith</u> is not determinative.

### D.  Defendants' Claim That Juror Martin Failed To Disclose Material Information During *Voir Dire* Is Timely

The undersigned first considers whether the recent discovery that Juror Romie Martin failed to disclose certain information during *voir dire*  [i.e., that he had been a crime victim and that he "knew of" the defendants and their alleged prior drug activities in the community]  constitutes "new evidence" for purposes of Rule 33.

As discussed, *supra*, <u>Smith</u> does not appear to preclude a finding that newly discovered facts, information or circumstances *having the potential to affect the integrity of the verdict* constitutes newly discovered evidence pursuant to Rule 33.   Given the nature of the defense argument regarding Juror Martin, namely, that Martin possessed a bias against both Defendants, and based upon the rationale of <u>Holmes</u>, this information is considered evidence newly discovered for purposes of Rule 33 and is, therefore, considered to be timely.[15]

### III.  Sixth Amendment Juror Bias Claim /
### Juror Martin's Failure To Disclose During *Voir Dire*

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the

---

[15] While the Government is correct in stating that <u>Smith</u> analyzes Rule 33 by considering both the language of the rule and its purposes, it is not the place of the district court to extend <u>Smith</u> such that it overrules the holding of <u>Holmes</u>.

right to a . . . trial[] by an impartial jury." U.S. Const. amend. VI. Consequently, biased jurors are prohibited from serving on criminal juries. *See* Conaway v. Polk, 453 F.3d 567, 584 (4th Cir. 2006) (analyzing juror bias in context of federal habeas action challenging state conviction) (*citing* United States v. Wood, 299 U.S. 123, 133 (1936)).

### A. *McDonough* Test

In order to be granted a new trial on the basis that Juror Martin failed to disclose information during *voir dire*, the Defendants must show that:

> 1) Juror Martin failed to answer honestly a material question on *voir dire*; and
> 2) That a correct response from Juror Martin would have provided a valid basis for a challenge for cause.

*See* McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, (1984) ("One touchstone of a fair trial is an impartial trier of fact - "a jury capable and willing to decide the case solely on the evidence before it."") (*citing* Smith v. Phillips, 455 U.S. 209, 217 (1982)).

In Conoway, the Fourth Circuit describes an additional aspect of the juror bias analysis – an inquiry regarding fairness. *See* Conoway, 453 F.3d at 585 n. 20 (*citing* Jones v. Cooper, 311 F.3d 306, 310-13 (4th Cir.2002)). According to the Fourth Circuit, in addition to satisfying McDonough, before a new trial is ordered, a litigant must show that the fairness of his trial was affected either by the juror's "motives for concealing the information" or the "reasons that affect the juror's impartiality." Id. (*quoting* McDonough, 464 U.S. at 556.) Fitzgerald similarly requires the Court to determine also whether "the error had substantial and injurious effect or influence in determining the ... verdict," or whether grave doubt exists that it had such an effect. Fitzgerald v. Greene, 150 F.3d 357, 365 (4th Cir.1998) (*citing* Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (*quoting* Kotteakos v. United States, 328 U.S. 750, 776 (1946); O'Neal v. McAninsch, 513 U.S. 432 (1995))

(*internal quotations omitted*).  Accordingly, in the event the Court finds that Martin's presence on

the jury was error and that the <u>McDonough</u> test is satisfied, the Court must consider what affect, if

any, such error had on the verdict.  In other words, instances of juror misconduct and bias, like other

alleged trial errors, are also evaluated for harmlessness.  <u>Id.</u> (*internal citations omitted*).

**1.  *Voir Dire***

Juror Martin was seated as Juror No. 6 in the first group of fourteen potential jurors

announced by the Courtroom Deputy.  (Trial Tr.: 6:2)  The Court allowed the attorneys to conduct

*voir dire*.  At the outset of *voir dire*, the Government announced the trial as the case of United States

versus Kendrick Tremayne Oakley, also known as Kenny Oakley and Derek Rayshawn Parks, also

known as Bam Parks or Bam Bam Parks.  (Trial Tr.: 6:24 thru 7:2)  The Government affirmatively

stated that Oakley and Parks were the two defendants in the case,  read the Government's witness

list, and described the drug conspiracy charge outlined in Count One of the Bill of Indictment.   (Trial

Tr.: 7:3 - 8:9)   The prosecutor's <u>first</u> <u>question</u> to the panel was whether they knew "any of the

courthouse personnel, the lawyers or the defendants."

> **MS. SHAPPERT:** So my first question for the 14 of you who are currently
> in the box, my first question is do you know any of the courthouse personnel, the
> lawyers or the defendants at this point in time?

(Trial Tr.: 8:10-13)   Juror Martin remained silent.

Another individual within the original array of fourteen, Mr. Banner (seated as Juror No. 1),

was recognized immediately by Ms. Shappert.  Ms. Shappert asked, "Mr. Banner, you and I know

each other."  (Trial Tr.: 8:14)  Mr. Banner agreed.  (Trial Tr.: 8:15)  After a brief colloquy, and

upon a motion by the Government, Mr. Banner was excused for cause without objection.   (Trial

Tr.:8:16  - 9:5)

After a replacement for Mr. Banner was seated, the prosecutor repeated her question, addressing the entire array of potential jurors once again:

> **MS. SHAPPERT:** Okay. To the 14 of you, do any of you, other than Mr. Banner who's left us, do any of you know any of the court personnel, any of the lawyers or the defendants? If you would raise your hand, please.

(Trial Tr.:9:9-12)  There was no response.  (Trial Tr.: 9:13)  Once again, Juror Martin remained silent.[16]

### 2. Martin's Testimony During December 2008 Evidentiary Hearing

Martin was relatively vague about what exactly he had been told, by whom, and what his impressions of the Defendants were as a result. Martin, who could not identify Investigator Allard at the evidentiary hearing, testified that his memory and faculties were not what they should be in light of the recent passing of his wife and grandson (approximately two months prior). (Hr'g Tr.: 20) While his testimony was less than crisp, Martin presented as generally credible despite appearing confused with much of what was being asked of him.[17]

---

[16] In addition to the prosecution's express and direct questions, the Court also read certain preliminary instructions to the entire jury pool before *voir dire* began. (Multiple juries were picked on this date.) While the court reporter does not ordinarily transcribe this portion of the proceedings, it is the standard practice of the undersigned, followed during this trial term, generally to explain the following concepts: the duty of the jury; evidence; rules for criminal cases; that the court will provide a summary of the applicable law and instructions at the end of the case; the conduct of the jury; and the course of the trial. (*See* FEDERAL JUDICIAL CENTER, BENCHBOOK FOR DISTRICT COURT JUDGES § 2.07 (4th ed. 2000)). In explaining the conduct of the jury, the potential jurors are instructed that they are not to discuss the case with anyone and that if anyone tries to discuss the case with them it should be brought to the court's attention promptly, that they should not read or listen to anything touching upon the case in anyway, that they should not try to do any research or investigate the case on their own because they are to decide the case solely based on the evidence coming from the witness stand, and that they are not to form any opinion until all the evidence is in and the jury deliberations are under way. After this particular jury was impaneled, the Court repeated many of these same instructions. (Trial Tr.: 68-75)

[17] Based upon the information provided by Martin on his juror questionnaire, completed in November 2006, Martin (DOB: 10/1/39) would have been sixty-seven years old at the time of his actual jury service in January 2007 and sixty-nine at the time of the evidentiary hearing. (Hr'g Tr.: 19) It further

Juror Martin testified unequivocally that he did not ***personally*** know Defendants. However, Martin explained that he had knowledge of both Defendants' reputations in the local community as being "involved in" or "dealing in" drugs.[18] More specifically, Martin described discussions that had taken place at his place of employment ***prior to jury selection*** in which multiple co-workers allegedly commented that both Defendants were known to be involved in drugs.[19] Martin was unable to state exactly when he learned of the Defendants' reputation in the community but testified repeatedly that the "talk" about Oakley and Parks occurred prior to his being designated a juror and before the trial began.[20] (Hr'g Tr.: 6-9) Martin also agreed at least twice that he possessed this knowledge at the time he was impaneled as a juror. (Hr'g Tr.: 7, 9) Martin recalled being asked whether or not he knew anybody in the courtroom and that he answered "no." (Hr'g Tr.: 6) When questioned further about his negative response, and specifically whether he believed at the time that he "knew" both Defendants, Martin explained, "I'd seen them on the streets driving cars. I live here in Statesville, yes sir. I'd seen them. . . . I don't know them, no. No, not personally." (Hr'g Tr.: 6)

When asked about his failure to disclose what he had heard about Defendants' reputations in

---

appears that Martin had some technical / vocational training beyond high school.

[18] In fact, both Defendants Oakley and Parks have prior felony drug convictions in state court, all of which were prosecuted in Iredell County, North Carolina Superior Court. Defendant Oakley's three prior felony drug convictions occurred in June 1996 and August 2003. (Document #3) Defendant Parks' had only one prior felony drug conviction from April 2002. (Document #5)

[19] Martin explained that his co-workers somehow knew (or guessed) that he might be seated as a juror <u>in this case</u> but did not explain how members of the public or other citizens in the community would have known *in advance* on which of many federal trials docketed Martin might end up serving as a juror, or even whether his jury summons related to civil or criminal cases, or both.

[20] The parties did not explore whether or not such comments may have been made to Martin during the morning of January 18th – *after* being selected to sit on the jury but *prior* to resuming his jury service mid-day.

the community, Martin stated that he didn't "remember nobody even asking [him] about that part of it." (Hr'g Tr.: 9)  When asked whether it was his impression at the time he was impaneled as a juror that Defendant Parks had previously been involved in drugs, Martin answered as follows: "I'd heard, yeah, but I don't know – no, I don't know nothing about the drug parts, no."  (Hr'g Tr. at 8.)

Martin also appears to have retracted parts of his original statement to Allard during his sworn testimony.  According to the defense, Martin initially made comments about Defendants' past conduct that reflected a belief they were going to "get off."  (Compare Interview Tr.: 14; and Hr'g Tr.: 12-13)  Martin denied making any such comment during the evidentiary hearing.

### 3. Analysis

Defendants contend Juror Martin twice deliberately concealed material information in responses to questions from counsel and the Court.[21]  (Motion at 9.)  The Government suggests that Martin's silence does not amount to an omission under McDonough because Martin had never been formally introduced to either of the Defendants.

The McDonough test applies equally to deliberate concealment and innocent nondisclosure.[22]

---

[21] Defendants also assert that Martin concealed the fact that he had been a victim of a crime.  As mentioned during the evidentiary hearing by the prosecution, however, it appears to the undersigned that Martin may not have understood the meaning of the term "victim," or may not have understood the question as a whole.  Because this issue is not determinative of Defendants' motion for new trial, the Court need not discuss it further.

[22] The veracity of Martin's answers is relevant to the question of actual bias.  In earlier applications of McDonough, the Fourth Circuit attempted to evaluate whether the question posed actually elicited a given response such that the juror's response could be deemed dishonest.  For example, in Fitzgerald, the Fourth Circuit  considered what the outcome should be where a juror answers honestly but incorrectly during *voir dire*, and explained that juror dishonesty is a factor to be considered in determining actual bias.  *See* Fitzgerald,  150 F.3d at 364 n. 3.  In Billings, the Fourth Circuit similarly looked to whether the juror's response was "misleading, disingenuously technical, or otherwise indicative of an unwillingness to be forthcoming" in assessing whether a specific response tended to show bias.  *See* Billings, 441 F.3d at 245 n. 2.

*See* Conner v. Polk, 407 F.3d 198 (4th Cir.2005) (*citing* Jones, 311 F.3d at 310.)  Without deciding

whether Juror Martin's answers during *voir dire* were "honest" or not, the Court assumes that the

first prong of McDonough is satisfied.  The term "know" generally means "to be acquainted or

familiar with." Merriam-Webster Online Dictionary (2008), available at http://www.merriam-

webster.com.  The questions asked by the prosecution regarding any tie or connection to either party

were "material" in that they were specifically designed to identify and gauge any potential bias.

Although Juror Martin testified during the evidentiary hearing that he did not personally "know" the

Defendants, he was familiar enough with both as he was able to recall observing them briefly eight

to ten years in the past.  Juror Martin should have volunteered his knowledge of the Defendants

during *voir dire*.[23]

The second part of the McDonough  test requires the Court to consider whether a correct

response from Juror Martin would have provided a valid basis for a challenge for cause.[24]  A juror

is properly excluded for cause if the juror's "views would prevent or substantially impair the

performance of his duties as a juror in accordance with his instructions and his oath."  United States

v. Fulks, 454 F.3d 410, 427 (4th Cir. 2006) (*quoting* Wainwright v.Witt, 469 U.S. 412, 424 (1985)).

As a general rule, actual bias is typically required for challenges for cause.  *See* Person v. Miller, 854

---

[23]  Although the undersigned would think it reasonable to expect an affirmative response from Juror Martin (who had never personally met the Defendants) in light of the prosecutor's question  asking whether the potential jurors "knew" any of the identified persons, the undersigned declines to find that Martin's answer was dishonest.  To do so would depend too much on the exact wording of the question, the context in which it was being asked, and the individual's subjective understanding.  As indicated above, Martin did not give the impression of dishonesty.

[24]  At the motion hearing, the prosecution suggested the Government might stipulate, for purposes of argument, that a challenge for cause may have existed, but then redirected the focus of its presentation to whether dismissal would have been required due to juror bias.  (Hr'g Tr.: 52-53)  This inquiry necessarily overlaps with the requisite analysis of juror bias, which is discussed, *infra*. (*See* Section "III, B")

F.2d 656, 664 (4ᵗʰ Cir.1988) (*citing* United States v. Loucas, 629 F.2d 989, 992 (4ᵗʰ Cir.1980)); *see also* United States v. Capers, 61 F.3d 1100, 1105 (4ᵗʰ Cir.1995) (relevant inquiry in deciding a challenge for cause is whether the juror can "be fair and impartial and decide the case on the facts and law presented"). Indeed, in a capital sentencing context, the Fourth Circuit held that failure to excuse a prospective juror for cause constitutes an abuse of discretion in only two situations: (1) where a *per se* rule of disqualification applies; and (2) where the court "demonstrates a clear disregard for the actual bias" of the juror. Fulks, 454 F.3d at 432 (*quoting* United States v. Turner, 389 F.3d 111, 115 (4ᵗʰ Cir.2004)). Neither of the bases identified in Fulks as requiring dismissal for cause are presented here.

**B.  Bias**

Where a general Sixth Amendment claim challenging the partiality of a juror is based upon additional circumstances occurring outside of the actual *voir dire* process, the Court must also consider whether any bias, in fact, existed. *See* Fitzgerald, 150 F.3d at 362-63. In assessing a possibility of bias, examination of Juror Martin's motives and the "reasons that affect a juror's impartiality" is appropriate. Conner, 407 F.3d at 206-07 (*citations omitted*).

The Court may require a post-trial hearing wherein "the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred." Fulks, 454 F.3d at 432  (*quoting* Fitzgerald, 150 F.3d at 363 (*internal cite omitted*)); *See also* Smith v. Phillips, 455 U.S. at 214; *see also* Remmer v. United States, 347 U.S. 227 (1954). Accordingly, during the evidentiary hearing, Defendants were provided "an unfettered opportunity to uncover any juror bias." Fitzgerald, 150 F.3d at 357. Because Defendants do not contend that Juror Martin harbored any actual bias, the Court discusses only whether Defendants have made out

a case for implied bias under the Sixth Amendment.

When bias is said to be implied rather than actual, bias is imputed as a matter of law in light of the circumstances. In Fitzgerald v. Greene, the Fourth Circuit contrasted actual and implied bias by explaining that the Court does not trust the juror's own assessment of bias in the face of a potential for implied bias. *See* Fitzgerald, 150 F.3d at 365 (accepting Juror Bradsher's statement regarding lack of effect on verdict and declining to invoke implied bias where juror nor anyone in his family was personally connected to any of the parties). The Supreme Court, which has been reluctant to imply bias, has openly criticized this approach to resolving juror impartiality claims. *See* Smith v. Phillips, 455 U.S. at 215-217. The Supreme Court stated in Smith:

> These cases demonstrate that due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* . . . .

Id. at 217.

In any event, "the doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." Fitzgerald, 150 F.3d at 365 (*quoting* Person v. Miller, 854 F.2d 656, 664 (4th Cir.1988)). The examples of such extreme situations (*i.e.*, personal or emotional connections) giving rise to an implied bias finding acknowledged by the Fourth Circuit include employer / employee, close relative, and a witness to (or individual somehow involved in) the criminal transaction. Id. (*internal*

*citations omitted*).

In <u>Fulks</u>, the Fourth Circuit determined that bias was not shown or implied by a juror's honest and inadvertent failure to disclose on her juror questionnaire that her husband was a murder victim. *See* <u>Fulks</u>, 454 F.3d at 432. The court credited the juror's testimony that she inadvertently left the question regarding crime victims blank and was surprised that she was selected to serve on a capital case. <u>Id.</u> The court ultimately held that a new trial was not warranted. Similarly, in another case applying <u>McDonough</u>, the Fourth Circuit declined to imply bias where a journalist who had covered the first trial was seated in the second trial. *See* <u>Conner</u>, 407 F.3d at 206. The Fourth Circuit held that bias could not be implied solely upon the later discovery that the journalist-juror had personal knowledge of the defendant's previous trial due to her work-related coverage of the first trial. <u>Id.</u> Implied bias not having been found under the facts in <u>Fulks</u> or <u>Conner</u>, the undersigned finds the less compelling facts here likewise do not support a conclusion of implied bias.

In sum, Defendants have not established that Juror Martin was impliedly biased against Defendants. At most, Juror Martin knew or had heard something of Defendants' respective reputations in the community. Martin never had any personal dealings with either of the Defendants, nor did Martin possess any personal knowledge about the charged conduct. Martin was consistent in advising Investigator Allard and the Court that he based his verdict ***on the evidence presented during trial*** as opposed to any extraneous discussions overheard regarding Defendants' reputations in the community. Under our precedent, a juror's general awareness of an accused's reputation in the community, even for conduct of the type charged in the case, presents no intimate relationship or connection and no exceptional circumstance warranting a finding of implied bias. Although this Court likely would have excused Juror Martin for cause in an abundance of caution, Defendants fail

to establish that an implied bias existed that would have ***required*** the Court to excuse Juror Martin for cause. For these reasons, the Court finds that the second prong of <u>McDonough</u> is not met.

### C. Fairness Inquiry / Substantial and Injurious Effect or Influence

Defendants likewise fail to establish any prejudice. The Court must also determine whether Juror Martin's presence on the jury had a "substantial and injurious effect or influence in determining the jury's verdict." *See* <u>Fitzgerald</u>, 150 F.3d at 366. In <u>Fitzgerald</u>, the Fourth Circuit determined that no such error had been shown. In doing so, the Fourth Circuit considered the overwhelming evidence of defendant's guilt, his propensity for future dangerousness, and the vileness of defendant's crimes and found that Bradsher's presence on the jury did not result in actual prejudice. <u>Id.</u> This case is like <u>Fitzgerald</u> in the sense that the Government presented overwhelming evidence of Defendants' guilt.

Aside from Martin's own statements and testimony, the Court has little evidence before it upon which to assess harmlessness. Martin denied that he began his jury service believing that Defendants were involved in drugs. (Hr'g Tr.: 7) In fact, during *voir dire*, Martin was individually asked by the prosecutor whether he knew of "any reason . . . that [he] couldn't be fair and impartial." (Trial Tr.: 30) Martin's answer was "No, ma'am."[25] (Trial Tr.: 30) When questioned by defense counsel, Martin was again asked directly about his ability to be impartial and render a decision based on the evidence.

> **MR. TATE:** Anything about my client, Mr. Parks, that would cause you not to treat him fairly in this courtroom?

---

[25] Martin's failure to volunteer any potentially relevant information in response to these more general, open-ended questions regarding impartiality do not constitute an omission for purposes of the first prong of the <u>McDonough</u> test. *See* <u>Billings v. Polk</u>, 441 F.3d 238, 244-45 (4th Cir.2006) (no dishonest failure to disclose where general question about impartiality is posed to juror). Moreover, <u>McDonough</u> does not provide any relief where a juror innocently fails to disclose information that might have been elicited by questions counsel did not ask. *See* <u>McDonough</u>, 464 U.S. at 555.

**JUROR MARTIN:** No, sir.

**MR. TATE:** Do you think you could render a decision based on the evidence in this case –

**JUROR MARTIN:** Yes, sir.

**MR. TATE:** – and nothing more?

**JUROR MARTIN:** Yes, sir.

**MR. TATE:** And if the evidence was – showed that he was not guilty, you could find him not guilty?

**JUROR MARTIN:** Yes, sir.

(Trial Tr.: 45-46)

In addition, for the most part, Martin's testimony at the hearing was consistent with the statements he made during the interview conducted by Investigator Allard. In the interview, Martin assured Allard that his vote to convict Defendants was based on the evidence presented during the course of the trial. (Interview Tr.: 7; Hr'g Tr.: 21) Investigator Allard specifically asked Juror Martin whether he knew the Defendants were guilty ahead of time in light of how he knew them. Martin responded: "No, no, no. That didn't convince me. It was what I'd seen, what they presented to us in the courthouse is what made me see they were guilty." (Interview Tr.: 7) Martin similarly denied that having seen Defendants driving around town and hearing of their reputations made the evidence more believable. Again, Martin answered: "Not necessarily. It's what they presented to us in court." (Id.) Therefore, the record tends to show that Martin followed the Court's instructions that his verdict must be based solely upon the evidence presented at trial.[26]

---

[26] At the conclusion of the evidence, the Court instructed the jury as follows:

It is your duty and your responsibility in this trial to find the facts. You may find those

Moreover, there is no evidence that Juror Martin shared any of this information with the other jurors. Juror Martin testified that despite his prior knowledge of the Defendants, he "never said nothing[sic] to nobody[sic] about it . . . ."[27] (Hr'g Tr.: 7) Martin's silence throughout *voir dire*, the trial, and jury deliberations tends to show that Martin was not motivated in any way by the things he had heard about the Defendants. Martin's silence similarly undercuts any argument that Martin secretly hoped to be selected as a juror so as to improperly influence the other members of the jury with the information. In sum, neither the facts presented nor the applicable law compels a finding that Juror Martin deliberately concealed this prior knowledge from the Court based upon an improper motive. Juror Martin's failure to disclose this information during *voir dire*, while unfortunate, is deemed harmless.

## IV. Other Claims

The other two defense claims are summarily denied. As for Defendants' arguments that the jury was affected by the intimidation and / or threats, the materials presented in connection with the instant motion are not significantly different either in kind or in scope than the information of improper juror contact that the Court was presented with during the trial. (Trial Tr.: 569-573)

---

facts only from the evidence which has been presented during this trial. The evidence consists only of the testimony of the various witnesses who have been called, sworn and testified in your presence, the exhibits which have been admitted into evidence by the Court, and any stipulation of fact made by the parties.
***
You are required to perform these duties without bias, prejudice, or sympathy for any party. The law does not permit jurors to decide cases on the basis of bias, prejudice, sympathy or any perceived public opinion or on any basis other than solely upon the basis of the facts and the law arising in that particular case.

(Trial Tr.: 1006-07) The jury is presumed to have followed these instructions. *See* Weeks v. Angelone, 528 U.S. 225, 234 (2000).

[27] Martin's testimony on this point is consistent with the interview transcripts provided to the Court by the defense after the evidentiary hearing.

(defense argument that Juror Jolly's emotional reaction to threat tainted the entire jury)  Accordingly, this particular evidence and legal argument is not "newly discovered," and is properly denied as untimely.  Likewise, there is no evidence to support Defendants' claim that any "separate" deliberations (or improper use of prayer) occurred that might have cast doubt on the unanimity of the verdict.[28]

## V.  Order

Having considered the overwhelming evidence of guilt as to both moving Defendants, and for all of the reasons stated herein, **IT IS HEREBY ORDERED** that Defendants' Motion for New Trial is **DENIED**.

Signed: February 5, 2009

Richard L. Voorhees
United States District Judge

---

[28] The undersigned struck the hearing testimony of former juror Darvin Earl Punch from the bench as a sanction for defense counsel's failure to share with the Government the fact that Allard's juror interviews were recorded and transcribed.  However, the Court notes that were Punch's testimony to be considered, it effectively disposes of the separate deliberation claim.  Punch testified that all twelve jurors were Christians and that prayer was undertaken jointly by all twelve jurors during their deliberations and while they were seated around the table.  (Hr'g Tr.: 26-28)  In other words, Punch's testimony makes clear that no separate juror deliberations occurred.  Punch's testimony is basicly consistent with the interviews of the other jurors (Allard Interview Trs. –  L. Williams: 5; T. Cooper: 8-9; C. Robins: 9-10), and not inconsistent with the hearing testimony of  Juror Martin. (Hr'g Tr.: 18-19)